IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ARLENE HALLOWAY, as Personal Representative
of PATRICIA WILLIAMS,

    Plaintiff,

v.                                                                         CIV 10-0844 JCH/KBM

BNSF RAILWAY CO. and XYZ CORPORATIONS 1-5,
ABC PARTNERSHIPS 1-5, and LMN BUSINESSES 1-5,

    Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Defendant BNSF Railway Company's Motion for Summary Judgment to Dismiss the Complaint with Prejudice [Doc. 114]. Having reviewed the parties' submissions and the relevant law, the Court finds the Motion is well taken in part and should therefore be granted in part.

## Background

This case arises out of the death of Patricia Williams, Plaintiff's adult niece, who was killed upon impact by a train operated by Defendant BNSF Railway Company ("BNSF") on September 8, 2007. *See* Doc. 1-2 at ¶ 11. There are two sets of tracks near the location where Ms. Williams was killed, both running east-west. Plaintiff's original Complaint, which was filed the day before the statute of limitations was set to expire, alleged that the train on the north track, which was eastbound, struck Ms. Williams. *See id. See also* NMSA 1978, § 37-1-8 (providing a three-year statute of limitation "for an injury to the person or reputation of any person); NMSA 1978, § 41-2-2 (providing that every action brought under New Mexico's Wrongful Death Act "must be brought within three years" of the date of death).

Plaintiff originally alleged that crew of the eastbound train was negligent in four ways: (1) it "failed to sound the train horn and bell at all, to warn Patricia Williams, of the approaching danger," *see id.* at ¶ 9; (2) it "failed to apply the braking system or otherwise slow the train in order to avoid colliding with Patricia Williams," *see id.* at ¶¶ 10, 19; (3) it "failed to keep a proper lookout ahead of their train in order to avoid the incident," *see id.* at ¶ 17; and (4) it "was traveling at an unreasonable rate of speed prior to the collision with Patricia Williams," *see id.* at ¶ 18.

It is undisputed, however, that it was actually a westbound train, which was traveling on the south track and was also operated by BNSF, that struck and killed Ms. Williams. As to the westbound train, Plaintiff originally alleged only that it "failed to warn Patricia Williams of the impending incident." *Id.* at ¶ 21. The Court recently permitted Plaintiff to amend her complaint to conform to the evidence. *See* Doc. 254. Plaintiff's Amended Complaint continues to allege that the eastbound train was negligent in the same four ways—(1) failure to warn, *see* Doc. 125-1 at ¶¶ 12, 20, 26; (2) failure to brake, *see id.* at ¶¶ 13, 24; (3) failure to keep a proper lookout, *see id.* at ¶ 21; and (4) traveling at an unreasonable rate of speed, *see id.* at ¶ 22. Plaintiff makes the identical allegations concerning the westbound train. *See id.* at ¶¶ 13, 14, 21, 22, 23.

Defendant BNSF seeks summary judgment as to all allegations of negligence on the part of the eastbound train as well as Plaintiff's claim that the westbound train negligently failed to warn Ms. Williams. *See generally* Doc. 114. BNSF also argues that Plaintiff's additional state-law claims of negligent training and supervision are preempted by federal law and should therefore be dismissed. *See id.* at 19-23.

**Legal Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a).  A "genuine" dispute exists where the evidence is such that a reasonable jury could resolve the issue either way.  *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).  A mere scintilla of evidence in the non-movant's favor is not sufficient. *Anderson*, 477 U.S. at 252.  However, the court must consider all the evidence in the light most favorable to the party opposing summary judgment.  *See Trask v. Franco*, 446 F.3d 1036, 1043 (10th Cir. 2006).

Both the movant and the party opposing summary judgment are obligated to "cit[e] to *particular parts* of materials in the record" to support their factual positions.  FED.R.CIV.P. 56(c)(1)(A) (emphasis added).  Alternatively, parties may "show[] that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  FED.R.CIV.P. 56(c)(1)(B).  *See also Medlock v. United Parcel Service, Inc.*, 608 F.3d 1185, 1189 (10th Cir. 2010) ("[I]f the matter in issue concerns an essential element of the nonmovant's claim, the moving party may satisfy the summary judgment standard 'by identifying a lack of evidence for the nonmovant on [that] element.'" (internal quotation and citation omitted) (alteration in original)).  Materials cited to establish the presence or absence of a genuine dispute must be in a form that would be admissible in evidence.  FED.R.CIV.P. 56(c)(2).

The court need only consider the materials cited by the parties.  FED. R. CIV. P. 56(c)(3). In the event that a party fails to cite materials or otherwise properly address another party's

assertion of fact, the court may consider the fact undisputed and, if the motion and supporting materials show that the movant is entitled to it, grant summary judgment. FED. R. CIV. P. 56(e). The court is also empowered to grant summary judgment, if appropriate, independent of the motion after giving notice and a reasonable time to respond. FED. R. CIV. P. 56(f).

## Analysis

The facts in this case are largely undipusted. There is no dispute, for example, that Ms. Williams was struck by the westbound, rather than the eastbound train. *See* Doc. 114 at 7, ¶ 6 ("Patricia Williams was never located on the north, Main #1, track. She was standing on the south, Main #2, track. The eastbound train did not hit Patricia Williams."); Doc. 122 at 2 (admitting BNSF's Fact 6) and 14 ("As already discussed, the westbound train struck Ms. Williams.").

Although the parties contest their significance, the facts pertaining to the acts of the eastbound crew are, likewise, not in dispute. Mr. B.A. Mead, engineer of the eastbound train, saw Ms. Williams approach the south track as his train passed by her. *See* Doc. 114-6[1] at 11. Before the westbound train passed and obscured his view of Ms. Williams in his rearview mirror, Mr. Mead "noticed her stagger a bit. And then stood up in between the tracks, in between the rails of the south track, and was facing west waving." *Id.* at 12. From the first time Mr. Mead saw Ms. Williams and throughout the time he watched her in his rearview mirror, until the time his eastbound train passed her, Mr. Mead never saw the oncoming westbound

---

[1] Defendant BNSF's Exhibit 4 and Plaintiff's Exhibit 3 are excerpts from the deposition of Mr. Mead. The Court cites to BNSF's version because Plaintiff's Exhibit 3 does not provide page numbers of the depositions, leaving the Court largely unable to identify the testimony to which Plaintiff refers. *See United States v. Dunkel*, 927 F.3d 955, 956 (7th Cir. 1991) ("Judges are not like pigs hunting for truffles buried in briefs").

train.  *See* Doc. 122-3 at 17.  He testified that he "kept an eye on [Ms. Williams] until the westbound [train] went by [him]."  *Id.* at 14.  After the westbound train passed his locomotive, Mr. Mead "reacted, [] woke up out of my daze or whatever it was."  *See* Doc. 114-6 at 12.  Mr. Mead explained what he meant by his "daze" comment at his deposition, stating, "I meant I was surprised.  I was not in a daze, I was concentrating on the person on the rail."  Doc. 144-1 at 2.  Mr. Mead stated, "I meant that when the train passed me, it got my attention.  It took all my concentration away from her to everything else going on arround me, controlling my train."  *Id.* at 3.

Consistent with Mr. Mead's account, Mr. Darrell W. Brown, conductor of the eastbound train, saw Ms. Williams make her way toward the south track at the time the eastbound train passed her.  *See* Doc. 122-7 at 11.  Mr. Brown lost sight of Ms. Williams before she reached the south track, when she was about five feet from the south track.  *See id.* at 11-12.  Like Mr. Mead, Mr. Brown also testified that it was only after the eastbound train passed Ms. Williams that he noticed the westbound train approaching.  *See id.* at 12.

For purposes of this Motion, Defendant BNSF's primary focuses is not on whether the crew of the eastbound train owed a duty to act, but on whether any act or omission by the eastbound train caused a compensable injury to Plaintiff.  *See, e.g.,* Doc. 114 at 4 (arguing that "the speed of the eastbound train or whether the crew sounded the horn, or whether they braked or slowed the train, are immaterial because Ms. Williams was not on the Main #1, north track where they eastbound train was traveling and the eastbound train did not strike her.").  To prevail on her claims against BNSF related to the eastbound train, Plaintiff must show that the acts or omissions of the eastbound train "contribut[ed] to bringing about the injury."  *See* UJI 13-305 NMRA 2012.

The applicable standards are also undisputed. GCOR 1.1.2 provides that "[e]mployees must be careful to prevent injuring themselves or others. They must be alert and attentive when performing their duties and plan their work to avoid injury. Doc. 122-6 at 1. GCOR 5.8.2 provides that a "succession of short sounds" by the whistle is indicated "when persons or livestock are on the track at other than road crossings at grade. In addition in addition, it is used to warn railroad employees when an emergency exists, such as a derailment. When crews on other trains hear this signal, they must stop until it is safe to proceed." Doc. 122-6 at 2.

I. **Given the Undisputed Material Facts, A Reasonable Jury Could Not Find That Ms. Williams' Death Was Caused or Contributed to By the Eastbound Train's Failure to Slow or Brake or By the Rate of Speed at Which the Eastbound Train Was Traveling.**

The undisputed material facts show that Ms. Williams was never on the north track where the eastbound train was traveling. Indeed, it is undisputed that Ms. Williams only began walking toward the south track after the eastbound train had already passed her. Mr. Brown testified that he lost sight of Ms. Williams when she was approximately five feet away from the south track. Mr. Mead explained that he watched Ms. Williams stumble and stand on the south track through his rearview mirror, after the eastbound train had passed her. As such, there is no basis upon which a reasonable jury could find that the eastbound train's failure to slow or brake along the north track caused or contributed to Ms. Williams' death, which was undisputedly a result of impact from the westbound train, traveling exclusively upon the south track.

Similarly, the rate of speed at which the eastbound train was traveling could not have caused or contributed to Ms. Williams' death because Ms. Williams was never on the north track, where the eastbound train was traveling.

Summary judgment will be therefore be granted in Defendant BNSF's favor as to Plaintiff's claims arising from the speed of the eastbound train or its failure to slow or brake.

## II. Summary Judgment is Not Appropriate As to Plaintiff's Claims that the Eastbound Train Failed to Keep a Proper Lookout and Failed to Warn the Westbound Train that Ms. Williams was Standing On Its Track.

Neither Mr. Mead nor Mr. Brown saw the westbound train approaching until after their train (the eastbound train) had passed Ms. Williams.  *See* Doc. 122-3 at 17 (Mr. Mead did not see the oncoming westbound train until after it passed his locomotive); Doc. 122-7 at 12 (Mr. Brown first noticed the oncoming westbound train "after we passed [Ms. Williams]").  Plaintiff specifically notes that Mr. Mead was in a "daze," watching Ms. Williams approach and stand on the south track.  *See* Doc. 122 at 6, 16.  *See also* Doc. 114-6 at 12.

The parties dispute the significance and effect of Mr. Mead's "daze."  Arguably, had either Mr. Mead or Mr. Brown been keeping a proper lookout, they may have had time to sound their whistle, causing the westbound train to stop before it reached Ms. Williams.  GCOR 5.8.2 provides that crews on other trains "must stop until it is safe to proceed" after hearing a succession of short sounds on a train's whistle.  *See* Doc. 122-6 at 2.  Theoretically, had the eastbound train sounded its whistle appropriately when Mr. Mead saw Ms. Williams get onto the south track, the westbound train would have been obligated to stop.  Thus, Plaintiff argues that the eastbound train's failure to sound its whistle as a warning not to Plaintiff but to the westbound train is a cause of Ms. Williams' death.

Under the circumstances of this case, Mr. Mead testified that "at [his] discretion," he had no obligation to sound his horn.  *See* Doc. 122-3 at 17.  Mr. Brown testified similarly, stating that he and Mr. Mead complied with GCOR 5.8.2 in that "[w]e did not ring our bell or the whistle."  *See* Doc. 122-7 at 8.  In accordance with the testimony of its employees, Defendant

BNSF seeks to limit the scope of the duty to warn to situations in which a pedestrian is endangered by the Defendant's own train, rather than, as is in this case, another train on a nearby track. *See* Doc. 114 at 18 ("[A]s a matter of law the eastbound train crew's duty to slow or brake did not arise, because Ms. Williams was never in a position of danger from being struck by their train, and slowing their train would have had no effect on her actions.").

Defendant points to no evidence in the applicable standards that demonstrates the duty is so limited. GCOR 5.8.2 indicates that *other* trains are obligated to stop when the succession of short sounds is heard, suggesting that Defendant's view of the duty is too limited. Moreover, none of the cases cited by Defendant concerning the scope of the duty owed supports such a limitation. Accordingly, the Court denies summary judgment to Defendant BNSF on Plaintiff's failure-to-keep-a-proper-lookout and failure-to-warn claims concerning the eastbound train.

**III.    Given the Undisputed Fact that the Westbound Train Sounded Its Horn Continuously for at least 14-15 Seconds Before Impact With Ms. Williams, Who Never Reacted to the Horn or the Sound of the Train, The Court Finds It Would Be Illogical and Speculative For a Jury to Find That Some Additional Warning of the Westbound Train Proximately Caused Ms. Williams' Death.**

BNSF argues that Plaintiff's claim that the westbound train failed to warn Ms. Williams should be dismissed because it is undisputed that the westbound train sounded its horn for a total of 17 seconds, including 14-15 seconds before impact. *See* Doc. 114 at 7-8, ¶¶ 8-10; Doc. 122 at 2-3 (admitting facts in ¶¶ 8-10). It is also undisputed that Ms. Williams, despite the horn sounding behind her, "never reacted to the horn sounding behind her and never turned to look easterly towards the approaching westbound train." Doc. 114 at p. 8, ¶11 and p. 19; Doc. 122 at 2 (admitting facts in ¶ 11).

Plaintiff contends that summary judgment is not appropriate because the engineer of the westbound train, Patrick Orr, "did not use the emergency repetitive 'short signal' horn the entire

time he was sounding the horn as he was required to do under GCOR 5.8.2.  *See* Doc. 122 at 15.  Plaintiff argues that either the short signal or the earlier use of the emergency brake by the westbound train could have attracted Ms. Williams' attention and prevented her death.  *See id.* at 15-16.

In a case somewhat similar to the present case, the United States District Court for the Northern District of Ohio held that "[i]t is illogical to conclude that the 3-second delay in sounding the whistle prejudiced [the decedent's] ability to hear the whistle (when it would have been much further from the crossing), since she did not appear to hear the whistle when the train was upon her."  *Petre v. Norfolk S. Ry. Co.*, 458 F.Supp.2d 518, 535 (N.D. Ohio 2006).

By the same token, the Court finds it illogical in the present case to conclude that the use of a short signal or "the exhaust of air from the emergency brake application," *see* Doc. 122 at 16, would have gained Ms. Williams' attention considering that Ms. Williams appeared not to hear a continuous 17-second blast even as the train was upon her.  Further, any finding that the lack of additional warning caused Ms. Williams death, would be speculation on the part of the jury.  *See, e.g., Bones v. Honeywell Intern., Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) ("To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." (quotation omitted)).  The Court will therefore grant summary judgment in favor of Defendant BNSF as to Plaintiff's failure-to-warn claims relating to the westbound train.

**IV.    Any Question of Preemption of Excessive Speed Claims is Moot Given the Court's Dismissal of Plaintiff's Claim That the Eastbound Train Was Traveling at an Excessive Speed.**

BNSF's Motion addresses Plaintiff's claims of excessive speed solely with regard to the eastbound train.  *See* Doc. 114 at 13-16.  The Court has dismissed such claims because, since M. Williams was never standing on the same track as the eastbound train, the speed of the eastbound train could not have proximately caused Ms. Williams' death.  *See* Part I, *infra*.  In the interest of judicial economy and in recognition of Plaintiff's Amended Complaint, which alleges that the westbound train was also traveling at an excessive speed, the Court would consider addressing Plaintiff's excessive speed claims with regard to the westbound train.  However, the parties have not alleged any facts alleged relating to the speed of the westbound train at or near the time that it hit Ms. Williams.

**V.    Plaintiff's Claims for Improper Training and Supervision Are Preempted.**

The United States Supreme Court set out the law of preemption as it relates to railroads in *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658 (1993).

> Where a state statute conflicts with, or frustrates, federal law, the former must give way.  In the interest of avoiding unintended encroachment on the authority of the states, however, a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find pre-emption.  Thus, pre-emption will not lie unless it is the clear and manifest purpose of Congress.  Evidence of pre-emptive purpose is sought in the text and structure of the statute at issue.  If the statute contains an express pre-emption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent.

*Id.*, 507 U.S. at 663-664 (internal citations and quotations).

The Federal Rail Safety Act of 1970 ("FRSA") was passed by Congress in order to "promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. Congress expressly preempted state laws regulating rail safety in order to gain national uniformity of regulation. *See* 49 U.S.C. § 20106(a)(2). "Under this scheme, then, state regulations can fill gaps where the Secretary has not yet regulated, and it can respond to safety concerns of a local rather than national character." *Burlington N. and Santa Fe Ry. Co. v. Doyle*, 186 F.3d 790, 795 (7th Cir. 1999).

As applicable to the present case, the Code of Federal Regulations set forth requirements for initial training of locomotive engineers and require continuing education, including requiring each railroad to "provide for the continuing education of certified locomotive engineers to ensure that each engineer maintains the necessary knowledge, skill and ability concerning personal safety, operating rules and practices, mechanical condition of equipment, methods of safe train handling (including familiarity with physical characteristics as determined by a qualified Designated Supervisor of Locomotive Engineers), and relevant Federal safety rules." *See* 49 C.F.R. § 2403.123(b) and (c). Moreover, railroads must "periodically instruct each [] employee on the meaning and application of the railroad's operating rules in accordance with a written program retained at its system headquarters and at the division headquarters for each division where the employee is instructed." 49 C.F.R. § 217.11. Beyond this, the federal regulations also provide for supervision of railroad employees, including establishing requirements for supervisors, *see* 49 C.F.R. § 240.105, and for continued monitoring of employees, *see, e.g.,* 49 C.F.R. § 240.129.

Although there does not appear to be authority from the Tenth Circuit regarding preemption of negligent training and supervision claims, the Honorable Judge Robert Brack of

this District has held that negligent training claims are preempted by the Federal Railroad Safety Act. *See Vigil v. Burlington N. and Santa Fe Ry. Co.*, 521 F.Supp.2d 1185, 1213 (D.N.M. 2007). In so holding, Judge Brack referenced decisions by other Circuit Courts of Appeal. *See id.* For instance, the Ninth Circuit held that "[i]t is clear that the federal training regulations do 'substantially subsume' the subject of employee training." *Union Pac. R.R. Co. v. Calif. Pub. Utils. Comm'n*, 346 F.3d 851, 868 (9th Cir. 2003) (noting further that the federal regulations under FRSA require railroads to "periodically instruct each [] employee on the meaning and application of the railroad's operating rules in accordance with a written program"). Likewise, the Seventh Circuit held that the State of Wisconsin's additional regulations providing "qualification requirements for locomotive engineers [] and for trainmen [] are preempted." *Doyle*, 186 F.3d at 804-805.

More recently, the Honorable Christina M. Armijo of this District found that both negligent training and negligent supervision claims were preempted by regulations pursuant to FRSA. *See BNSF Ry. Co. v. LaFarge Southwest, Inc.*, Case No. CIV 06-1076 MCA/LFG (D.N.M. Dec. 8, 2008). Noting the same regulations set forth herein, Judge Armijo concluded that "[49 C.F.R.] Part 240 covers the same subject matter as—and consequently preempts—New Mexico law addressing the tort of negligent supervision." *Id.* at. p. 31.

Plaintiff argues that a "clarification amendment" to the FRSA preemption provision in 2007 should affect the Court's ruling in the present case. *See* Doc. 122 at 19-21. However, as Defendant BNSF points out, multiple authorities contradict Plaintiff's argument. *See* Doc. 144 at 21. In accord with the vast majority of case law and interpretation concerning the 2007 amendment to FRSA, the Court finds that it does nothing to call the prior decisions of Judges

Brack and Armijo into question. The Court will therefore grant Defendant's Motion and dismiss, with prejudice, Plaintiff's state-law claims for negligent training and supervision.

## Conclusion

For the reasons set forth herein, the Court will grant Defendant's Motion in part and dismiss, with prejudice, Plaintiff's claims relating to the speed of the eastbound train, the failure of the eastbound train to slow or stop, the failure of the westbound train to warn Ms. Williams, and state-law claims relating to negligent training or supervision of either the eastbound or the westbound crews.

**IT IS THEREFORE ORDERED** that Defendant BNSF Railway Company's Motion for Summary Judgment to Dismiss the Complaint with Prejudice [Doc. 114] is **GRANTED IN PART and DENIED IN PART**.

_____
**UNITED STATES DISTRICT COURT JUDGE**